IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:   1:20-cv-02761-MEH
Member Case No:   1:20-cv-03105-MEH

TIMOTHY BUSH,

    Plaintiff,

CRETE CARRIER CORPORATION, as subrogee for other Timothy Bush,

    Consolidated Plaintiff,

v.

TRAVEL CENTERS OF AMERICA, INC., d/b/a TA Operating LLC, TA Operating Corporation, TA Truck Service, and TA Wheat Ridge Dedication: Danny & Cindy George, CO #174,

    Defendant,

TRAVEL CENTERS OF AMERICA, INC., d/b/a TA Operating LLC,
TA OPERATING CORPORATION,
TA TRUCK SERVICE,
TA WHEAT RIDGE DEDICATION: DANNY & CINDY GEORGE, CO #174,

    Consolidated Defendants.

## ORDER

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court is the Motion for Summary Judgment ("Motion") filed by TA Operating LLC ("TA").[1] ECF 42. The Motion is fully briefed, and the Court finds that oral argument would

---

[1] TA indicates in the Motion that although other defendant entities are listed in the Complaint, TA is the appropriate defendant in this case. ECF 42 at 1 n.1. Neither Plaintiff nor the Consolidated Plaintiff challenge this assertion.

not materially assist in its adjudication. For the following reasons, the Motion is granted in part and denied in part.

## BACKGROUND

Although the Court provides a findings of undisputed facts, the Court also provides a cursory recitation of the facts here. Plaintiff Timothy Bush ("Plaintiff") was a truck driver who decided to stop at one of TA's locations on July 22, 2018. He drove his truck to a parking lot with a space that had a yellow, "RESERVED" sign in the middle of it. After he removed the sign and parked his truck, Plaintiff exited the vehicle. As he did so, he became injured when he tripped and fell due to the condition of the asphalt. At the time of this incident, Plaintiff was within the course and scope of his employment as a truck driver for Consolidated Plaintiff Crete Carrier Corporation ("Consolidated Plaintiff"). Plaintiff went into TA's store at which point a TA employee told Plaintiff he would have to move his truck because the space was not available and he had not prepaid for it.

## STANDARDS OF REVIEW

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—

his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws

all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

The following are the Court's findings of material facts that are relevant to the Court's analysis and either undisputed or supported by the record, when viewed in the light most favorable to the non-moving parties. The Court has categorized these facts based on which party offered them.

**TA's Facts in Its Motion**

1. TA managed the TA Express located at 12151 West 44th Avenue, Wheat Ridge, Colorado 80033, including all parking areas thereon, on July 22, 2018. TA was therefore a "landowner" as defined under Colorado's Premises Liability Act at all relevant times. ECF 5, Compl. ¶¶ 10, 34–35, 47–48; ECF 41, Amend. Answer ¶¶ 34–35, 47–48.

2. At about 3:15 p.m. on July 22, 2018, Plaintiff claims he sustained injuries when he stepped out of the cabin of his truck and fell as the result of uneven pavement. Compl. ¶¶ 10–15.

3. At the time of the incident, Plaintiff was parked in the spot pictured in Exhibit A(1) attached to the Motion. ECF 42-2; ECF 42-1, Dep. of Timothy Bush ("Bush Dep.") at 58:19–59:24. Plaintiff took these photos after the incident occurred and while he was on his way back from reporting it to TA. Bush Dep. at 59:6–9.

4. The yellow sign seen in page 1 of Exhibit A(1) positioned in front of Plaintiff's truck was marked "RESERVED" and was the same kind of sign as the one pictured in Exhibit A(2). ECF 42-3; Bush Dep. at 92:18–93:18.

5. The yellow, RESERVED sign was there to notify drivers the subject spot was a paid parking spot. When Plaintiff arrived, the RESERVED sign was positioned in the middle of the

4

parking spot. Plaintiff moved it out of the way, parked in the reserved spot, then moved the RESERVED sign back to the middle of the spot, in front of his truck. Bush Dep. at 59:25–61:9.

6. Plaintiff understood that spots with a RESERVED sign were reserved for anyone that pays for it. *Id.* at 137:17–22. Plaintiff did not pay for the reserved spot before arriving on TA's property. *Id.* at 137:23–25.

7. While checking to see if parking was available (after the incident had occurred), Plaintiff was told that all of TA's paid parking was previously paid for and that he would have to move his truck from the parking spot. *Id.* at 85:21–24.

8. In 2013, TA began using a reserved parking system, where drivers could pay for a parking spot prior to getting to a TA location via telephone, an app, or a website, which would ensure them a parking spot. Drivers would pull in and notify TA they were at the location, and TA's security officer would move the reserved parking sign and allow the driver to park. ECF 42-4, Dep. of former TA General Manager Bobby Cornish ("Cornish Dep.") at 91:3–20.[2]

9. The reserved signs were placed at the very front of the reserved parking spots. *Id.* at 92:20–21; ECF 42-5, Decl. of TA District Manager Thomas Hughes ("Hughes Decl.") at ¶ 6.

10. In addition to reserving a spot through telephone, an app, or a website, drivers have the option to reserve one upon arrival at either the fuel desk or the UltraONE kiosk. ECF 49-2, Plaintiff's Ex. 2. at DEF 0212.

11. It was never an official TA policy that drivers were permitted to park in a reserved spot prior to making a reservation by either calling, using the app, or using the website. Cornish Dep. at 122:25–123:5; Hughes Decl. at ¶¶ 4–5.

---

[2] The parties dispute whether this is the only method of reserving a spot, but that dispute does not create a genuine dispute of material fact about whether such a system existed.

12.     If a driver moved a reserved parking sign, parked in a reserved spot, *then* contacted TA to pay for the reserved spot in which they parked, TA would verify if a spot was available, and if not, the driver would be told to park in a different parking spot. Cornish Dep. at 92:22–93:17; Hughes Decl. at ¶¶ 5, 8.

13.     The parties dispute whether a driver who parked in a reserved spot without making a reservation in advance would be parking in the spot without TA's permission. ECF 42 at 5, ¶ 13; ECF 49 at 5, ¶ 13; ECF 48 at 4, ¶ 13.

14.     At the time of the incident, Plaintiff was in the course and scope of his employment as a driver with Consolidated Plaintiff. ECF 6 in 20-cv-03105-MEH at ¶ 11.

15.     As a result of Plaintiff's claimed injuries, Consolidated Plaintiff paid workers' compensation benefits to and on behalf of Plaintiff. *Id.* at ¶ 17.

**Plaintiff's Additional Facts in His Response Brief**

16.     Plaintiff pulled into the TA location because that is where his fuel computer told him to go, and so he could send his paperwork, eat, and rest. ECF 49-1, Plaintiff's Ex. 1 at 51:12–19.

17.     After he fueled up and got his receipt, he pulled around and parked. *Id.* at 52:2–5.

18.     There were only three spots available, and the rest were filled up with trucks. *Id.* at 53:2–12.

19.     The other two spots available were also reserved paid parking and were adjacent to the spot Plaintiff chose. *Id.* at 61:10–15.

20.     He picked the open one that was closest to the door. *Id.* at 51:20–24.

21.     Plaintiff was exiting the truck to go inside and pay for the spot when he fell. *Id.* at 53:13–22.

22. After Plaintiff went inside, he learned that all the paid parking had already been reserved and he would have to move his truck; he was allowed to move it near a fuel island that was closed for maintenance where he could finish his safety report and notify dispatch of everything. *Id.* at 85:20–86:7.

23. After being told this, Plaintiff went back out to his truck, took pictures, then moved his truck where they told him to and notified dispatch. *Id.* at 59:4–15, 85:20–86:7, 87:7–13.

24. Plaintiff testified that at other Travel Centers locations, he had been allowed to move the sign out of the way, park, and then go inside and pay, and he believed he was allowed to do that at this TA location. *Id.* at 134:3–11.

25. Plaintiff testified that a manager at a different Travel Centers location told him that if there was not an open spot available, go ahead and park in reserved parking to get the truck out of the way and then come in and pay. *Id.* at 136:21–137:2.

26. Plaintiff testified that at the various truck stops that have pay-and-park, including different ones on the East Coast, you can pull in and then pay at the fuel desk. *Id.* at 86:12–88:14.

27. Even if there is a reserved sign in a space, it does not mean that someone has paid for the specific spot, because you must check with the fuel desk to know if spots are available. *Id.* at 89:4–17.

28. When someone ordered reserve parking in advance, it did not assign or reserve him or her a specific spot; it just guaranteed a spot would be available. *Id.* at 91:3–15.

29. The reserved sign simply indicates it is a reserved type space, it does not mean that particular spot has been reserved and there is nothing to indicate a particular spot has been reserved; the reserved signs stay there all the time. ECF 49-3, Plaintiff's Ex. 3 at 136:15–137:15, 137:25–138:5.

30. If a driver parked in the reserve lot before making a reservation and then came in to pay, he or she was not reprimanded; instead, TA would simply check to see if the spot was available. *Id.* at 93:7–17.

31. At least once a day a driver would pull into the reserved spot, after moving the sign, and then come and in to pay for the spot. *Id.* at 92:22–93:6.[3]

32. The photograph of the area near the truck's driver's side door shows uneven, broken blacktop. Ex. A-1.

33. While Plaintiff was stepping down from his truck he stepped into the puddle, or one of the cracks near the bottom of the steps, turned his ankle, and fell. Plaintiff's Ex. 1 at 62:8–21.

34. Areas of the parking lot frequented by large commercial vehicles are more prone to deterioration. Plaintiff's Ex. 3 at 35:20–25.

35. There is more damage in the parking areas between the yellow lines, because that is where the heavy trucks sit. *Id.* at 23:7–18.

36. Shortly after the fall, investigators for Consolidated Plaintiff took photographs of the TA parking lot that showed places with potholes or broken blacktop in the truck parking area. ECF 49-4, Plaintiff's Ex. 4 at Crete 401–04.

37. Mr. Cornish was the manager of the TA truck stop when Plaintiff fell and had been there since January 2018. Plaintiff's Ex. 3 at 9:23–10:7.

---

[3] TA's reply brief indicates that it denies Plaintiff's Fact 31. ECF 62 at 4, ¶ 31. However, the denial makes clear that it is actually a denial of the next paragraph which references the condition of the parking lot. *Id.*; ECF 49 at 7, ¶ 32. The Court believes that TA omitted a paragraph number from its reply brief. This is confirmed by TA responding to fifty-four numbered paragraphs with Plaintiff asserting fifty-five numbered paragraphs in his response brief. Thankfully, it appears that TA's omission is the sole omission and that every remaining numbered paragraph corresponds to the numbered paragraph above it in Plaintiff's response brief (e.g., TA's paragraph 54 responds to Plaintiff's paragraph 55).

38. He received training on parking lot deterioration and what steps to take to resolve such hazards. *Id.* at 73:2–11.

39. District manager inspections of the TA location noted problems with the parking lot, including potholes. *Id.* at 59:24–60:15; ECF 49-5, Plaintiff's Ex. 5 at 3–4.

40. The picture in the inspection documentation represents what the parking lot looked like when Mr. Cornish was there. Plaintiff's Ex. 3 at 62:10–13.

41. The November 8, 2017 inspection also documents pothole problems with the parking lot, and the photos represent the condition of the lot while Mr. Cornish was there. *Id.* at 63:15–21; Plaintiff's Ex. 5 at 38.

42. TA recognized that potholes and cracked or raised concrete or blacktop could be hazards. Plaintiff's Ex. 3 at 29:6–15; ECF 49-6, Plaintiff's Ex. 6 at Def 058.

43. At least once a month the company would inspect for trip hazards, areas of disrepair, potholes, and the like. Plaintiff's Ex. 3 at 31:9–18, 33:23–34:8.

44. There were areas of concern in the commercial parking lot, including loose debris, the ground not being level, and ponding water. *Id.* at 46:7–14.

45. Mr. Cornish acknowledged that a pothole could be dangerous to those stepping out of a truck and could be an issue of concern. *Id.* at 76:11–77:5, 77:9–12.

46. The parking lot was in a state of disrepair while Mr. Cornish was there. *Id.* at 73:12–15.

47. The parking lot had issues, such as potholes and alligatoring. *Id.* at 74:20–75:9. Alligatoring is when water gets into cracks in the asphalt and causes it to break apart, but remain in place, so it looks like alligator skin. *Id.* at 39:28–40:3.

48. The disrepair in the parking lot was greater than TA could handle itself, so it needed a contractor for repairs. *Id.* at 47:14–22.

49.     The condition was too deteriorated for TA to just fix it with a patch. *Id.* at 47:4–13.

50.     Mr. Cornish testified that prior to repairs being made, the asphalt in the commercial parking lot was "pretty bad." *Id.* at 62:14–23.

51.     TA would get complaints about potholes in the parking lot about three times per month. *Id*. at 97:15–23.

52.     Mr. Cornish testified that if particular parking spaces had a problem, those spaces would not be taken out of service while TA was waiting for repairs to commence. *Id.* at 107:24–108:8.

53.     TA was aware of the condition of the parking lot. ECF 49-7, Plaintiff's Ex. 7 at 6, ¶ 5.

54.     There were no signs or warnings regarding the condition of the premises. *Id.* at 7, ¶ 6.

55.     Due to the amount of damage in the parking lot, a construction company came out to redo the parking lot after Plaintiff's fall. Plaintiff's Ex. 3 at 27:18–28:20. TA also performed repair work in 2015, prior to the incident. ECF 62-1, TA's Ex. D at 3, ¶ 1.

**Consolidated Plaintiff's Additional Facts in Its Response Brief**

56.     The subject property is a TA Travel Center that offers services and amenities to travelers, including commercial truckers. Among the services and amenities provided are: a restaurant; grab 'n' go food; truck maintenance; fueling; and truck parking, which may be reserved through "reserve-it." ECF 48-3, Ex. C.

57.     According to TA's website, parking spaces may be reserved "upon arrival at the site, if a space is available." ECF 48-4, Consol. Plaintiff's Ex. D.

58.     There are more than 275 TA Travel Centers, with locations in almost every state in the United States. ECF 48-5, Ex. E.

59.     On the date of the incident giving rise to this litigation, Plaintiff's was on TA's property to purchase fuel, send in paperwork from his prior load, eat, and rest. ECF 48-2 at 51:14–19.

10

60.     Plaintiff purchased fuel from TA, then drove to the subject parking space and parked. *Id.* at 60:20–22.

61.     After the incident giving rise to this litigation, Plaintiff went into TA's store to pay Defendants for the parking space he had parked in, only to find out, at that time, that the spot had already been reserved by someone else. *Id.* at 60:24–61:2, 89:18–90:4, 137:3–10.

## ANALYSIS

Plaintiff brings two claims in this action. The first is for premises liability. The second is for negligence. The Consolidated Plaintiff brings subrogation claims. TA has moved for summary judgment on all claims. The Court will address each in turn.

**I.      Plaintiff's Premises Liability Claim**

Under Colorado law, the Colorado Premises Liability Act ("the Act") "provides the exclusive remedy against a landowner for injuries sustained on the landowner's property." *Corder v. Folds*, 292 P.3d 1177, 1178 (Colo. App. 2012). Depending on the injured party's reason for being on the land, the Act classifies the party into one of three categories: invitee, licensee, or trespasser. *Id.* The Act defines those three categories as follows:

> (a) "Invitee" means a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain.
>
> \*\*\*
>
> (c) "Licensee" means a person who enters or remains on the land of another for the licensee's own convenience or to advance the licensee's own interests, pursuant to the landowner's permission or consent. "Licensee" includes a social guest.
>
> (d) "Trespasser" means a person who enters or remains on the land of another without the landowner's consent.

11

Colo. Rev. Stat. § 13-21-115(7). "[T]he court shall determine whether the plaintiff is a trespasser, a licensee, or an invitee . . . ." *Id.* § 13-21-115(6).

"A landowner owes the greatest duty of care to an invitee, a lesser duty to a licensee, and the least duty to a trespasser." *Warembourg v. Excel Electric, Inc.*, 471 P.3d 1213, 1221 (Colo. App. 2020). A landowner is liable to an invitee only for "damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers the landowner actually knew about or should have known about." Colo. Rev. Stat. § 13-21-115(4)(c)(I). As to a licensee, the landowner's liability extends only to injuries stemming from the "unreasonable failure to exercise reasonable care with respect to dangers created by the landowner that the landowner actually knew about," or the "unreasonable failure to warn of dangers not created by the landowner that are not ordinarily present on property of the type involved and that the landowner actually knew about." *Id.* § 13-21-115(4)(b). Finally, "[a] trespasser may only recover damages willfully or deliberately caused by the landowner." *Id.* § 13-21-115(4)(a). "A plaintiff's status may change if he or she exceeds the scope of the landowner's invitation to access the property." *Warembourg*, 471 P.3d at 1221 (citing *Chapman v. Willey*, 134 P.3d 568, 569–70 (Colo. App. 2006)).

Here, the parties agree that when Plaintiff first drove onto the property, he was an invitee. TA argues that Plaintiff's status changed to a trespasser when he parked in the reserved spot without permission. Plaintiff contends that he was an invitee at all times, because TA consented to the ability to park in the reserved spot without first paying for it. "[A] landowner may consent to entry, absent express words, by his or her course of conduct." *Corder*, 292 P.3d at 1180–81; *see also Reid v. Berkowitz*, 315 P.3d 185, 189 (Colo. App. 2013) ("The term 'consent' as used in the statute included implied consent."). "'[I]t is the manifestation of consent which is decisive and not the state of mind which the possessor intends to express.'" *Nelson v. United States*, 20 F. Supp. 3d

12

1108, 1137 (D. Colo. 2014) (quoting Restatement (Second) of Torts, § 330 cmt. d.), *reversed on other grounds*, 827 F.3d 927 (10th Cir. 2016). "'[T]he decisive factor is the interpretation which a reasonable person would put on the possessor's acts.'" *Id*.

Based on the record in this case, a reasonable person would not believe that he has consent to park in the reserved parking spaces. The most obvious reason is the yellow, RESERVED signs that occupy those spaces. To even be able to park in those spaces, one needs to move the sign out of the middle of the space. It is of no consequence that the signs do not say more as Plaintiff would like; a reasonable person would not see an obstructing, yellow, RESERVED sign as an invitation to park in that location without a reservation.

Nor does the Court find that some industry custom existed that permitted drivers to park in those spaces prior to paying. Plaintiff points to his testimony that a manager at a different TA location told him that if there was not an open spot available, go ahead and park in reserved parking to get the truck out of the way and then come in and pay. He further cites to the testimony from Mr. Cornish that at least once a day a driver would pull into the reserved spot, after moving the sign, and then come and in to pay for the spot. But neither of these establish a custom that would rise to the level of implied consent for parking in reserved spaces. First, what a manager said at a different location has no material bearing on the TA location at issue in this case. Second, Plaintiff's subjective belief that he could park there does not factor into what the "reasonable" person would think; that is, it is an objective (as opposed to subjective standard). *Id.* The record is devoid of any evidence suggesting that TA permitted non-paying drivers to use the reserved spaces. While there are various ways to reserve a spot ahead of time, none of them expressly allow for someone to park in the reserved spot first. Even the website says parking spaces may be reserved "upon arrival at the site, if a space is available." Consol. Plaintiff's Ex. D. The use of the

13

word "site" cannot be construed to refer to the reserved space since the word "space" is used unambiguously immediately after.

Next, Plaintiff argues that the lack of any reprimand to the drivers who allegedly illegally park in the reserved spaces constitutes consent for drivers to do so. True, the undisputed facts show that drivers would park in the reserved spaces without prepaying on a daily basis. But just because they do so does not mean that TA has consented to such actions. In fact, the undisputed facts also show that after confirming that no spot was available for reservation, TA officials would ask the driver to move the truck (i.e., an explicit recognition that the driver should not be in that spot). As to the lack of any reprimand, comment "c" of Section 330 of the Restatement (Second) of Torts states, in pertinent part:

> A mere failure to object to another's entry may be a sufficient indication or manifestation of consent, if the possessor knows of the other's intention to enter, and has reason to believe that his objection is likely to be effective in preventing the other from coming. *On the other hand, the fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifestation of consent, and therefore is not necessarily permission.* A failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavoidable, rather than consent to the entry as licensee. Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent to the intrusion of persons who habitually and notoriously disregard such notices.

Restatement (Second) of Torts § 330 cmt. c (emphasis added). TA already had an obstructing, RESERVED sign in those spaces. If drivers decided to park there anyway, it is reasonable to assume that TA would first check to see whether the spot was available before making the driver move. After all, if the spot was reservable at that time, it would have been a waste of effort to have the driver move first before returning to the space. For these reasons, the Court does not find the lack of reprimand to constitute consent, implied or otherwise.

Further, Plaintiff's citation to *Warembourg v. Excel Electric, Inc.* does not convince the Court that Plaintiff was an invitee. In that case, the plaintiff, an employee of a flooring company, provided flooring for a new home. 471 P.3d at 1217. The defendant, an electrical company, performed the electrical work at the home, including installing a temporary electrical box to supply power to the subcontractors. *Id.* One day, the plaintiff could not power his tools with the home's outlets, so he plugged a tool into the electrical box. *Id.* However, the outlet on the box also did not work. *Id.* The plaintiff removed the box's front cover to troubleshoot the problem and began toggling the breakers in the box. *Id.* After toggling one of the breakers, the box "exploded" and caused an electrical shock to the plaintiff's hand, causing permanent injuries. *Id.* The Colorado Court of Appeals affirmed the trial court's decision to consider the plaintiff an invitee at the time of his injury. *Id.* at 1222–23. The court reasoned that the plaintiff "operated within the scope of his authority" because there was no evidence that anyone told the plaintiff "he could not troubleshoot the malfunctioning box in the exact manner he did." *Id.* at 1223. The court relied also on the fact that the box "lacked legible warning stickers." *Id.*

In this case, Plaintiff did have a "warning sticker" in front of him: the yellow, RESERVED sign. He even had to move the sign out of the way before parking. Plaintiff relies heavily on the fact that nobody told him that he could not park in that space prior to paying and that prior practices indicated to him that he could park there. Unlike the *Warembourg* case, though, the only evidence that this is true is Plaintiff's subjective belief formed from the comment of a manager at a different TA location. In *Warembourg*, multiple employees of the electric company testified that subcontractors (like the plaintiff in that case) would commonly troubleshoot power problems by removing the panels on the electrical boxes. *Id.* at 1223. No such testimony exists in this case. To the contrary, the only relevant testimony from TA (Mr. Cornish's deposition) establishes that

15

although drivers would commonly and improperly park in the reserved spaces, they would be told they would have to leave the space if the space was not available. These material differences dictate a different result from the one reached in *Warembourg*.

For these reasons, the Court finds that Plaintiff's status as invitee when he drove onto the TA property changed when he parked in the reserved space. The question now is whether his status changed to a licensee or a trespasser. *See Roessler v. O'Brien*, 201 P.2d 901, 904 (Colo. 1949) ("By departing from the usual course traveled in entering or leaving the apartment, decedent became either a licensee or trespasser."). The relevant inquiry is whether Plaintiff entered the reserved parking space "without the consent of the possessor, or with such consent." Restatement (Second) of Torts, § 332 cmt. l. Particularly important in this case is the notion that

> [t]he mere fact that the possessor knows that invitees in general, or a particular invitee, will be likely to go into parts of the premises to which he is not invited, is not enough in itself to bring such places within the area of invitation, unless the visitor is reasonably led to believe that he is so invited.

*Id.* For the reasons the Court has explained earlier, just because other drivers may have commonly done what Plaintiff did in this case, namely park in the reserved space without prior payment, does not mean that TA consented to Plaintiff's ability to do so. *See id.* ("An invitation usually includes the use of such parts of the premises as the visitor reasonably believes are held open to him as a means of access to or egress from the place where his purpose is to be carried out."). Therefore, the Court concludes that Plaintiff lacked TA's consent and became a trespasser when he parked in the reserved space.

As a trespasser, TA is only liable to Plaintiff for "damages willfully or deliberately caused by" it. *Id.* § 13-21-115(4)(a). As an initial matter, Plaintiff does not argue, nor does the record support, a finding of deliberateness. However, "because of the 'or' in [the Act], a finding of 'willful[ness]' alone satisfies the [Act], and [the court] need not address whether [TA's] conduct

16

was also 'deliberate[].'" *Blood v. Quest Servs. Corp.*, 224 P.3d 301, 330 (Colo. App. 2009). Under Colorado law, "willfulness" occurs when an action is taken "voluntarily, purposefully, and with a conscious disregard for the consequences of [the] conduct." *Hohn v. Morrison*, 870 P.2d 513, 517–18 (Colo. App. 1993); *see also Nelson v. United States*, 915 F.3d 1243, 1251 (10th Cir. 2019). Willful actions do not require conscious awareness that the actions "'create danger or risk to the safety of others.'" *Nelson*, 915 F.3d at 1250 (citation omitted); *see also Pettingell v. Moede*, 271 P.2d 1038, 1042 (Colo. 1954) (contrasting "willful" with "wanton," the latter requiring someone being "wholly disregardful of the rights, feelings and safety of others").

Here, Plaintiff has demonstrated a genuine dispute of material fact on whether TA willfully caused his injuries. TA argues that the record has no evidence of such willfulness, but the Court finds otherwise. The record contains evidence that TA recognized that potholes and cracked or raised concrete or blacktop could be hazards. Plaintiff's Ex. 3 at 29:6–15; Plaintiff's Ex. 6 at Def 058. At least once a month the company would inspect for trip hazards, areas of disrepair, potholes, and the like, Plaintiff's Ex. 3 at 31:9–18, 33:23–34:8, but there were still areas of concern in the commercial parking lot, including loose debris, the ground not being level, and ponding water, *id.* at 46:7–14. Mr. Cornish acknowledged that a pothole could be dangerous to those stepping out of a truck and could be an issue of concern, *id.* at 76:11–77:5, 77:9–12, and the parking lot was in a state of disrepair while Mr. Cornish was there, *id.* at 73:12–15. TA would get complaints about potholes in the parking lot about three times per month. *Id*. at 97:15–23. Mr. Cornish testified that if particular parking spaces had a problem, those spaces would not be taken out of service while TA was waiting for repairs to commence. *Id.* at 107:24–108:8. It is undisputed that TA was aware of the condition of the parking lot. Plaintiff's Ex. 7 at 6, ¶ 5. A reasonable juror could look at this evidence and conclude that TA knew of the problem with the parking spaces, purposefully and

17

intentionally chose not to make timely repairs, and did so without regard to the consequences of failing to make such repairs. *Nelson*, 915 F.3d at 1255–56 (affirming trial court's decision to treat knowledge about a sinkhole on an asphalt path and the failure to warn or repair the sinkhole as willful conduct).

Because the Court cannot conclude that there is no genuine dispute of material fact as to TA's allegedly willful conduct, summary judgment is not appropriate on the premises liability claim.

## II.     Plaintiff's Negligence Claim

Plaintiff also brought a claim for negligence. However, the Act "provides the exclusive remedy against a landowner for injuries sustained on the landowner's property." *Corder*, 292 P.3d at 1178. Plaintiff did not address this issue in his response brief and has therefore waived argument. Nevertheless, because TA has admitted that it "was solely responsible for the parking lot and it has admitted it was a landowner," Plaintiff's sole remedy arises from the Act, and the negligence claim must be dismissed. ECF 42 at 12. Therefore, summary judgment is granted as to the negligence claim.

## III.     Consolidated Plaintiff's Subrogation Claims

TA also seeks summary judgment on the Consolidated Plaintiff's subrogation claims. The sole argument for summary judgment is that the "claims are merely derivative, and [the Consolidated Plaintiff] possesses no greater rights than Plaintiff, the subrogor." ECF 42 at 12 (citing *Colo. Farm Bureau Mut. Ins. Co. v. CAT Cont'l, Inc.*, 649 F. Supp. 49, 52 (D. Colo. 1986)). In other words, because TA hoped summary judgment would be granted on all of Plaintiff's claims, the Consolidated Plaintiff's claims must necessarily fail. Because the Court does not grant summary judgment as to the premises liability claim, it will not do so on the subrogation claims.

**CONCLUSION**

Accordingly, TA's Motion [filed April 4, 2022; ECF 42] is **granted in part** and **denied in part**. The Motion is granted as to Plaintiff's negligence claim, and summary judgment is entered in favor of TA on that claim. The Motion is denied as to all other claims.

Entered this 7th day of July, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge